UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ASHLEY G. ARAGONA, D.M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:10-CV-1610-G |
| DR. CHARLES BERRY, Individually, | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are two motions to dismiss brought by the defendants in this case (docket entries 43, 59).  Under the provisions of Federal Rule of Civil Procedure 12(d), the court has converted these motions to dismiss into motions for summary judgment.  For the reasons set forth below, the defendants' motions for summary judgment are granted.

## I.  BACKGROUND

### A.  Factual Background

This case concerns the treatment that the plaintiff received while he was a student at the Baylor College of Dentistry ("BCD").  The plaintiff, Ashley G. Aragona

("Aragona"), was a dental student at BCD.  Plaintiff's First Amended Complaint ("Complaint") ¶¶ 1.1, 3.1 (docket entry 36).  The individual defendants, Dr. Charles Berry ("Berry"), Dr. Stan Ashworth ("Ashworth"), and Dr. Mohsen Taleghani ("Taleghani") (collectively, "the individual defendants") were faculty and an administrator at BCD while Aragona was enrolled there.  *Id*. ¶¶ 1.2-1.4, 3.3.  The agency defendant, Texas A&M University System Health Science Center ("TAMHSC"), is an agency subdivision of the state of Texas; BCD is a branch of TAMHSC.  *Id*. ¶¶ 1.5, 3.1.

In the summer of 2008, Aragona started his final year of the BCD predoctoral dental program.  *Id*. ¶ 3.1.  Aragona was enrolled in the five-year program at BCD, instead of the standard four-year program, because he has attention deficit disorder ("ADD").  *Id*. ¶ 3.2.  Aragona's ADD "primarily manifests itself . . . as difficulty with organization."  *Id*. ¶ 3.19.

During the 2008 summer session, Aragona began to receive complaints from Ashworth concerning his progress in the program.  On June 10, 2008, Aragona missed a scheduled training session, because he had difficulty viewing an electronic schedule.  *Id*. ¶ 3.22.  That same day, Ashworth sent Aragona an e-mail stating "It's official.  You are now in trouble.  Not the way I wanted you to start the year."  *Id*.; *see also* Appendix to Individual State Defendants' Reply to Plaintiff's Response to Defendants' Second Amended Motion to Dismiss ("Individual Defendants' Reply

Appendix") at 7 (docket entry 51-1).  Around July 7, 2008, Ashworth "admonished" Aragona for having low numbers in his clinical attendance and "relative value points" Complaint ¶ 3.21.  Relative value points are "numbers that the General Dentistry Department has assigned to procedures done by the students on patients in the clinic[, divided] by the number of hours the clinic is open for patient care."  *Id.* ¶ 3.21 n.2.  And while Aragona's relative value points and clinic attendance were above course requirements, Ashworth evaluated Aragona as unsatisfactory in all areas.  *Id.*

Aragona continued to have problems with Ashworth during the fall session. On September 15, 2008, after one of the study models for a patient had broken, Ashworth told Aragona that he was "very disappointed" in Aragona's work in the clinic.  *Id.* ¶ 3.25.  Ashworth also asked Aragona to write a three-page paper on "professionalism and responsibility," and to bring the paper to their next meeting  *Id.* On September 19, 2008, Aragona and Ashworth met again.  *Id.* ¶ 3.26.  Ashworth became very upset when Aragona failed to timely deliver the professionalism paper. *Id.* ¶ 3.26.  It was at this meeting that Ashworth told Aragona of his plans to remove Aragona from the clinic and possibly BCD altogether.  *Id.* ¶ 3.30.

Soon after the September 19, 2008 meeting, Ashworth suspended Aragona from patient care in the clinic for one week for "professionalism" issues.  *Id.* ¶ 3.31. By September 25, Aragona was allowed to help other students with their clinical work.  *Id.* ¶ 3.32.  However, Aragona and Ashworth continued to have conflicts over

Aragona's conduct, and on September 27, 2008, Ashworth sent Aragona an e-mail stating that his attitude in a recent clinic was "insolent, argumentative, and petulant." *Id*. ¶ 3.34.  On September 28, 2008, Aragona received emails from Ashworth which told him to continue seeing his scheduled patients.  *Id*. ¶ 3.39.

On Monday, September 29, 2008, plaintiff delivered a letter to Berry, which asked Berry to reinstate Aragona's clinical privileges.  *Id*. ¶ 3.35.  This letter notified Berry of Aragona's ADD and stated that Ashworth had rejected Aragona's plan to accommodate his ADD by receiving organizational assistance from his Patient Appointment Associate ("PAA").  *Id*. ¶ 3.36.

On October 6, 2008, Aragona learned that his patients had been cancelled and that he had been assigned to a pediatric emergency rotation.  *Id*. ¶ 3.40.  On October 10, 2008, Aragona and Taleghani met to talk about "various incidents that have [occurred] since he began his senior year."  Appendix to Individual State Defendants' Second Amended Motion to Dismiss ("Individual Defendants' Motion Appendix") at 2 (docket entry 43-1).  These incidents allegedly included "[f]ailure to follow departmental and school policies," "failure to attend mandatory training sessions," "unprepared for clinical procedures," and "failure to follow prescribed infection control policies for chair units."  *Id*.  Eventually, Taleghani and Ashworth reinstated Aragona's privileges, but required him to review certain documents and to follow all policies and procedures.  Complaint ¶ 3.40.

- 4 -

On October 31, 2008, Aragona had a student conference with Ashworth.  *Id*. ¶ 3.46.  While Ashworth gave Aragona an unsatisfactory grade, he did give Aragona a satisfactory score for professionalism during the reporting period.

On December 4, 2008, Ashworth suspended Aragona's clinical privileges for a third and final time.  *Id*. ¶ 3.48.  In a memorandum titled "Clinical Privileges," Ashworth listed several incidents where Aragona had violated various BCD policies and guidelines.  *Id*.; *see also* Individual Defendants' Motion's Appendix at 4-6.  This memorandum contains an extensive list of rule violations by Aragona over the two month period before the memorandum was written.  Individual Defendants' Motion's Appendix at 4-6.  This list included Aragona's failure to respond for a TB test, failure to submit labwork on time, and failure to follow BCD rules regarding patient payment.  *Id*.  This memorandum also required Aragona to remediate the suspension by following a number of requirements.  Complaint ¶ 3.52.

In early January of 2009, Ashworth and Taleghani informed Aragona that he had not "fulfilled a successful completion" of his clinical privileges remediation, and that his case would be brought before the Student Promotions Committee.  *Id*. ¶ 3.55.  The Student Promotions Committee is a standing committee at BCD that monitors the academic progress of students.  *Id*. ¶ 3.56.  After a hearing on January 9, 2009, the Committee recommended that Aragona be withdrawn from BCD and repeat the academic year, following counseling with "a school approved psychiatrist

and/or physiologist" [psychologist?].  *Id*. ¶ 3.58.  On January 15, 2009, Aragona

learned that the Committee would hear Aragona's appeal from his dismissal.  *Id*.

¶ 3.60.  However, the Committee eventually decided to affirm its earlier decision.  *Id*.

¶ 3.61.  Aragona checked out of BCD on January 21, 2009.  *Id*. ¶ 3.62.

On January 27 and February 2, 2009, Aragona met with the school-appointed

psychologist.  *Id*. ¶ 3.63.  Because the Committee required that Aragona waive

patient-physician confidentiality, Long and Berry were able to openly discuss

plaintiff's sessions with the psychologist.  *Id*.  Finally, on February 12, 2009, Aragona

met with Berry and Long.  *Id*. ¶ 3.64.  At that meeting, Berry told Aragona that he

did not feel like the psychologist was getting to the "root" of Aragona's problems.  *Id*.

Eventually, Aragona was accepted into the Arizona School of Dentistry and

Oral Health.  *Id*. ¶ 3.65.  He began classes in July of 2009, and graduated on June 12,

2010.  *Id*.

## B.  Procedural Background

On August 18, 2010, Aragona filed his original complaint in this court (docket

entry 1).  On March 23, 2011, Aragona filed his first amended complaint, which

alleges (1) violations of both substantive and procedural due process rights under the

U.S. and Texas Constitutions, (2) conspiracy in violation of 42 U.S.C. § 1985,

(3) violations of free speech and academic freedom under the U.S. and Texas

Constitutions, and (4) violations of Title II of the Americans with Disabilities Act

("ADA") and Section 504 of the Rehabilitation Act.  Complaint ¶¶ 4.2-4.22.  On

July 1, 2011, the individual defendants filed a motion to dismiss all of Aragona's

claims under the provisions of Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6)

(docket entry 43).  On October 11, 2011, TAMHSC filed a similar motion to dismiss

(docket entry 59).

Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under

Rule 12(b)(6) . . ., matters outside the pleadings are presented to and not excluded by

the court, the motion must be treated as one for summary judgment under Rule 56."

Furthermore, "[a]ll parties must be given a reasonable opportunity to present all the

material that is pertinent to the motion."  FED. R. CIV. P. 12(d).  However, "[n]otice

in this context is satisfied if the nonmovant knows that the court *may* convert the

motion."  *Guiles v. Tarrant County Bail Bond Board*, No. 11-10643, 2012 WL 28255,

at *1 (5th Cir. Jan. 5, 2012) (emphasis in original).  "A non-moving party receives

adequate notice when it is aware that the movant has placed matters outside the

pleadings before the district court for its review."  *Id*.

In this case, both the individual defendants and TAMHSC submitted matters

outside the pleadings.  The individual defendants' motion to dismiss and reply both

contain appendices that offer material outside of the complaint and answer.  *See*

Individual Defendants' Motion Appendix at 1-6; Individual Defendants' Reply

Appendix at 1-17.  TAMHSC's motion to dismiss also contains extensive documents

that are outside the pleadings.  Appendix to Defendant The Texas A&M University System Health Science Center's First Amended Motion to Dismiss Pursuant to Rule 12 ("TAMHSC's Motion's Appendix") at 1-40 (docket entry 59-1).  As a result, to the extent that the defendants' motions are brought under Rule 12(b)(6), the court will treat them as motions for summary judgment.

Summary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FEDERAL RULE OF CIVIL PROCEDURE 56(a), (c)(1).  A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) ("An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham.").  To demonstrate a genuine dispute of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986).  The nonmoving party must show that the evidence is sufficient to support the resolution

of the material factual issues in his favor.  *Anderson*, 477 U.S. at 249 (citing *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288-89 (1968)).

When evaluating a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144 (1970)).  However, it is not incumbent upon the court to comb the record in search of evidence that creates a genuine dispute as to a material fact.  See *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).  The nonmoving party has a duty to designate the evidence in the record that establishes the existence of genuine disputes as to the material facts.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986).  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Malacara*, 353 F.3d at 405.

## II.  ANALYSIS

### A.  Substantive and Procedural Due Process Claims

Aragona has brought due process claims against the defendants under both the Federal and Texas Constitutions.  The Fourteenth Amendment to the U.S. Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV.  Article I, Section 19 of the Texas Constitution states that "[n]o citizen of this State shall be deprived of life,

liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tᴇx. Cᴏɴsᴛ. art I, § 19.  Despite the differences in language between these two clauses, "[i]t is clear that the protection afforded under the procedural due process rights granted by article I, section 19, are congruent with those in the Federal Constitution." *Price v. City of Junction, Texas*, 711 F.2d 582, 590 (5th Cir. 1983).  As a result, the analysis under both clauses merits the same result. *Id.*

In his complaint, Aragona alleges violations of substantive due process and procedural due process, both of which are protected under the Fourteenth Amendment. See *John Corporation v. City of Houston*, 214 F.3d 573, 577 (5th Cir. 2000); see also *Price*, 711 F.2d at 590 (Article 1, Section 19 "encompasses not only procedural, but also substantive, due process.").  "Substantive due process, by barring certain government actions regardless of the fairness of the procedures used to implement them, serves to prevent governmental power from being used for purposes of oppression." *John Corporation*, 214 F.3d at 577 (internal quotation and changes omitted).  In contrast, "[p]rocedural due process promotes fairness in government decisions by requiring the government to follow appropriate procedures when its agents decide to deprive any person of life, liberty, or property." *Id.* (internal quotations and changes omitted).

Aragona brings these due process claims under the aegis of 42 U.S.C. § 1983.

According to Section 1983, a plaintiff can recover damages for a violation of due

process if he proves that the defendants deprived him of a constitutional right or

privilege while the defendants were acting under color of state law.  See *id*.

### 1.  *Procedural Due Process*

"To establish a violation of the Fourteenth Amendment's guarantee of

procedural due process, a plaintiff must prove that (1) he was deprived of a life,

liberty, or property interest (2) without the process that was due." *Saucedo-Falls v.*

*Kunkle*, 299 Fed. Appx. 315, 319 (5th Cir. Nov. 6, 2008) (citing *Cleveland Board of*

*Education v. Loudermill*, 470 U.S. 532 (1985)).  However, a court can avoid the

constitutional interest question when it is clear that the plaintiff "has been awarded at

least as much due process as the Fourteenth Amendment requires." *Board of Curators*

*of the University of Missouri v. Horowitz*, 435 U.S. 78, 84-85 (1978).

In deciding what process a dismissed student is due, the appellate courts have

articulated a number of distinctions that determine the appropriate level of due

process.  First, students "are not entitled to as much procedural protection under the

Fourteenth Amendment as employees who are terminated from their jobs." *Davis v.*

*Mann*, 882 F.2d 967, 973 (5th Cir. 1989).  Second, more process is due to a student

who is dismissed for disciplinary reasons than for academic reasons.  *Horowitz*, 435

U.S. at 86.  A student is dismissed for disciplinary reasons when he violates a valid

rule of conduct. *Id.* at 87; see also *Shaboon v. Duncan*, 252 F.3d 722, 730 (5th Cir.

2001). In contrast, a dismissal is academic if it is "rested on the academic judgment

of school officials that the student did not have the necessary clinical ability to

perform adequately as a [health care provider] and was making insufficient progress

towards that goal." See *Horowitz*, 435 U.S. at 89-90.

As a result of these distinctions, when a student is dismissed for disciplinary

reasons, the Fourteenth Amendment requires that "the student be given oral or

written notice of the charges against him and, if he denies them, an explanation of

the evidence the authorities have and an opportunity to present his side of the

story.'" *Goss v. Lopez*, 419 U.S. 565, 581 (1975). Academic dismissals, by contrast,

"call[] for far less stringent procedural requirements." *Horowitz*, 435 U.S. at 86. This

is because academic "judgment is by its nature more subjective and evaluative than

the typical factual questions presented in the average disciplinary decision." *Id.* at 90.

As a result, the Supreme Court has chosen to "decline to ignore the historic judgment

of educators and thereby formalize the academic dismissal process by requiring a

hearing." *Id.*

However, students subject to academic dismissals are still entitled to some

procedural protections under the due process clause. In particular, a student "must

be given some meaningful notice and an opportunity to respond." *Davis*, 882 F.2d at

975 (citing *Matthews v. Eldridge*, 424 U.S. 319 (1976)). In *Davis,* the Fifth Circuit

determined that the plaintiff, a student dismissed for academic reasons, had received

adequate due process protections.  *Id*.  The court noted that the plaintiff had

"received frequent and detailed notice of his academic problems and potential

dismissal."  *Id*.  He received a hearing before an impartial committee, in anticipation

of which he received a detailed summary of the charges and witnesses against him.

*Id*.  At the hearing, he had counsel present and was allowed to cross-examine adverse

witnesses and to present his own version of the events.  *Id*.  Finally, the plaintiff in

*Davis* was allowed to appeal the decision of the committee to the Chancellor of the

University.  *Id*.

A student does not have any due process rights to the procedures established

by a state entity's rules or regulations.  *Jackson v. Texas Southern University--Thurgood*

*Marshall School of Law*, 231 S.W.3d 437, 439-40 ((Tex. App.--Houston [14th Dist.]

2007, pet. denied).  "[A]n individual does not acquire a substantive interest in

specific procedures developed by the State.").  As the Supreme Court has noted,

> Process is not an end in itself.  Its constitutional purpose is
> to protect a substantive interest to which the individual has
> a legitimate claim of entitlement . . ..  The State may
> choose to require procedures for reasons other than
> protection against deprivation of substantive rights, of
> course, but in making that choice the State does not create
> an independent substantive right.

*Olim v. Wakinekona*, 461 U.S. 238, 250-51 (1983).

In this case, Aragona alleges that the defendants violated his constitutional rights by depriving him of "his protected liberty interest in his good name and reputation, in his future practice of dentistry and in his public education, without due process and/or due course of law."  Complaint ¶ 4.5.  Aragona also claims that the defendants violated his due process rights by failing to follow BCD's due process policies.  *Id.* ¶ 4.6.

However, the pleadings demonstrate that BCD fulfilled its constitutional obligations by affording sufficient due process to Aragona.  First, Aragona suffered an academic dismissal because his problems stemmed from the BCD's judgment that he did not have the ability to perform adequately as a student in BCD's dental program.  Aragona claims that the dismissal was really disciplinary, instead of academic, in nature.  *See* Plaintiff's Response to Individual State Defendants' Second Amended Motion to Dismiss and Brief in Support ("Plaintiff's Response to Individual Defendant's Motion") at 4-8 (docket entry 50).  However, there is no evidence to suggest that Aragona was punished for any sort of behavioral misconduct.  Instead, Aragona's problems stem largely from his inability to act professionally in his clinical responsibilities.  *See, e.g.*, Individual Defendants' Motion Appendix at 4-6.

Second, Aragona was afforded more procedural due process than the constitution required.  From the beginning of the summer 2008 session, Aragona was repeatedly notified by Ashworth and Taleghani of the lapses in his clinical

performance.  *See, e.g.*, Complaint ¶¶ 3.21-3.53.  On January 9, 2009, Aragona was able to make his case before the Student Promotions Committee.  *Id*. ¶ 3.56.  And on January 16, 2009, Aragona was permitted reargue his case to the Committee again.  *Id*. ¶ 3.60.  The plaintiff's complaint shows that BCD clearly gave Aragona "some meaningful notice and an opportunity to respond."  See *Davis*, 882 F.2d at 975.

Finally, Aragona does not have a due process right grounded in the school's own due process policies.  See *Jackson*, 231 S.W.3d at 439-40.  Whether or not BCD failed to follow its own due process policies is irrelevant to Aragona's procedural due process claim.  Because the defendants fulfilled their procedural obligations under the Due Process clause, Aragona's claim for violation of procedural due process fails.

## 2.  *Substantive Due Process*

"Substantive due process 'bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them."'"  *Marco Outdoor Advertising, Inc. v. Regional Transit Authority*, 489 F.3d 669, 673 n.3 (5th Cir. 2007) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).  To establish a violation of substantive due process, "a plaintiff must prove that (1) he was deprived of a life, liberty, or property interest (2) in an arbitrary and capricious manner."  *Saucedo-Falls*, 299 Fed. Appx. at 319 (citing *Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993)).

- 15 -

To make out a claim under Section 1983 for a violation of substantive due process, the plaintiff must allege that the government actions were arbitrary and capricious.  "[S]ubstantive due process requires only that public officials exercise professional judgment, in a nonarbitrary and noncapricious manner, when depriving an individual of a protected property interest."  *Lewis v. University of Texas Medical Branch at Galveston*, No. 11-40456, 2011 WL 6357798 at *5 (5th Cir. Dec. 20, 2011) (internal quotations omitted).  To show that he was denied substantive due process, "the plaintiff must demonstrate that the state official acted with culpability beyond mere negligence."  *McClendon v. City of Columbia*, 305 F.3d 314, 325 (5th Cir. 2002), *cert. denied*, 537 U.S. 1232 (2003).  As the Supreme Court has emphasized, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

In this case, Aragona argues that he "has a claim against Defendants for violation of substantive due process for Defendants' arbitrary, capricious, unreasonable, and/or irrational actions taken against him."  Complaint ¶ 4.9.  As was the case in the procedural due process context, the court does not need to decide whether Aragona has pled a protected property or liberty interest.  This is because it is clear that the defendants did not act arbitrarily or capriciously in the actions they took concerning Aragona.  The exhibits that the defendants have attached to their filings demonstrate that Aragona had significant difficulty in properly fulfilling his

responsibilities at BCD.  *See* Individual Defendants' Motion Appendix at 1-6; Individual Defendants' Reply Appendix at 1-17; TAMHSC's Motion's Appendix at 1-40.  While Aragona provides explanations for some of these allegations, he does not appear to dispute the truth of any of them.  Moreover, Aragona's own complaint makes reference to many of the academic difficulties that the plaintiff had while at BCD.  Having reviewed all of the filings and submissions, the court concludes that BCD did not act arbitrarily or capriciously when it decided to discharge Aragona from the program.  Therefore, Aragona's claim for a violation of substantive due process fails.

B. <u>Section 1985</u>

Aragona also brings a claim under 42 U.S.C. § 1985.  Complaint ¶¶ 4.12-14. The only provision of Section 1985 that is relevant to this case is subsection (3).  42 U.S.C. § 1985(3).  This subsection creates a private civil remedy to prevent conspiracies for the purpose of depriving a person of equal protection of the laws.  *Id*. The Fifth Circuit has explained that, in order to state a claim under Section 1985(3), a plaintiff must allege facts demonstrating "(1) a conspiracy; (2) for the purpose of depriving a person of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or a deprivation of any right or privilege of a citizen of the United States."  *Lockett v. New Orleans City*, 607 F.3d 992, 1002 (5th Cir.), *cert. denied*, __ U.S. __, 131 S.Ct. 507 (2010).

- 17 -

As a result, in order to bring a claim under Section 1985(3), a plaintiff must properly plead a conspiracy.  However, "[i]t is a long-standing rule in this circuit that a corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) (internal quotations omitted). This "intracorporate conspiracy doctrine" has been applied to entities other than corporations.  *Id*.; see also *Baldwin v. University of Texas Medical Branch at Galveston*, 945 F.Supp. 1022, 1034 (S.D. Tex. 1996) ("A single legal entity, such as UTMB and its employees, is incapable of conspiring with itself for the purposes of § 1985."), *aff'd*, 122 F.3d 1066 (5th Cir. 1997).

In this case, the defendants are TAMHSC and its employees.  Because they are the same entity, they could not have conspired with each other to deprive Aragona of his rights.  As a result, the plaintiff's Section 1985 claim fails.

## C.  First Amendment

Aragona argues that the defendants violated his freedom of speech under the Federal and Texas Constitutions.  The First Amendment to the U.S. Constitution, applicable against the states through the Fourteenth Amendment, prohibits states from "abridging the freedom of speech."  U.S. CONST. amend. I.  Article I, Section 8 of the Texas Constitution states that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that

privilege." Tex. Const. art. I, § 8. "It is possible that Article I, Section 8 may be more protective of speech in some instances than the First Amendment." *Texas Department of Transportation v. Barber*, 111 S.W.3d 86, 106 (Tex. 2003) (internal quotations omitted), *cert. denied*, 540 U.S. 1177 (2004). However, "if it is, it must be because of the text, history, and purpose of the provision, not just simply *because*." *Id*. (internal quotations omitted) (emphasis in original). Aragona has brought his First Amendment claim under 42 U.S.C. § 1983.

In *Harris v. Pontotoc County School District*, 635 F.3d 685 (5th Cir. 2011), the Fifth Circuit explained that "[t]he First Amendment protects a public employee's speech in cases of alleged retaliation only if the speech addresses a matter of 'public concern.'" *Id*. at 692 (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). "Whether speech is of public concern is determined by the content, form, and context of a given statement, as revealed by the whole record." *Id*. (internal quotations omitted). "Rather than looking at whether the public might or would have an interest in the matter, the court examines whether the speaker's motivation was to speak primarily as a citizen or as an employee." *Id*. Moreover, in *Davis v. Mann*, 721 F.Supp. 796, 803-04 (S.D. Miss.1988), *aff'd*, 882 F.2d 967 (5th Cir. 1989), the district court applied the principles elucidated in *Harris* and *Connick* to a dental student who was dismissed from a residency program.

In this case, Aragona argues that the defendants violated his rights under the First Amendment when they "punished and/or retaliated against him when he opposed and spoke out about unlawful, arbitrary, and capricious practices and actions taken by [the defendants]."  Complaint ¶ 4.17.  However, he has not alleged any facts suggesting that his speech was of public concern, and therefore entitled to protection under the First Amendment.  *Harris*, 635 F.3d at 692; cf. *Davis*, 721 F. Supp. at 803-04.  Aragona's complaints only dealt with BCD's treatment of himself, and no one else.  There are no allegations that Aragona directed his speech to the public.  And the complaint gives no reason to believe that Aragona was speaking as a citizen instead of as a student wishing to complete his degree at BCD.  Therefore, Aragona's First Amendment claims against the defendants must fail.  Moreover, because Aragona has given no reason why the protections of the Texas Constitution extend beyond those of the Federal Constitution in this instance, Aragona's Article I, Section 8 claim fails as well.

### D.  Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act

Finally, Aragona argues that the defendants violated Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA").  Complaint ¶¶ 4.19-22.  In particular, Aragona argues that the defendants failed to

provide reasonable accommodations for his alleged learning disability.  *Id*. ¶ 4.21.[*]

The only accommodation that Aragona appears to have sought during the relevant

time period was a request to work more closely with his PAA.  Complaint ¶ 3.29.

Title II of the ADA and Section 504 of the RA both prohibit discrimination

against qualified disabled individuals.  First, Title II states that

> [N]o qualified individual with a disability shall, by reason
> of such disability, be excluded from participation in or be
> denied the benefits of the services, programs, or activities
> of a public entity, or be subjected to discrimination by any
> such entity.

42 U.S.C. § 12132.  Second, under Section 504,

> No otherwise qualified individual with a disability in the
> United States . . . shall, solely by reason of her or his
> disability, be excluded from the participation in, be denied
> the benefits of, or be subjected to discrimination under any
> program or activity receiving Federal financial assistance.

29 U.S.C. § 794.  Because both Title II and Section 504 have very similar language,

the legal standard for discrimination is the same under both Title II and Section 504.

---

[*]     In his responses, Aragona argues that he has essentially brought two disability claims:  one based on the defendants' alleged failure to provide reasonable accommodations, and one based on the defendants' alleged arbitrary and capricious discrimination.  Plaintiff's Response to Individual Defendants' Motion ¶ 2.5; Plaintiff's Response to Defendant The Texas A&M University System Health Science Center's Motion to Dismiss First Amended Complaint Pursuant to Rule 12 and Brief in Support ("Plaintiff's Response to TAMHSC's Motion") ¶ 2.7 (docket entry 60). However, in the section of Aragona's complaint that deals with his disability claims, he does not mention anything about "arbitrary or capricious" discrimination. Therefore, the court concludes that Aragona's only disability claim is the defendants' alleged denial of reasonable accommodations.

See *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567, 574 (5th Cir. 2002), *cert. denied*, 540 U.S. 810 (2003).

Under both Title II and the RA, discrimination by a public entity includes failing to make reasonable modifications or accommodations to the disabled individual, so that (s)he can participate in the programs or activities provided by the public entity. *See* 42 U.S.C. § 12131(2), 12132. The plaintiff bears the burden of requesting reasonable accommodations. *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 n.4 (5th Cir. 1999). If a plaintiff makes a valid request for reasonable accommodations, the public entity has an obligation to engage in an "interactive process" to determine the best means of accommodating the plaintiff's disability. *Id.* at 735. However, "the responsibility for fashioning a reasonable accommodation is shared between" the qualified disabled individual and the provider of public services. *Id*.

The process of finding and developing reasonable accommodations in the academic setting is slightly different than in the employment setting. Under the RA, a school must "make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student." 34 C.F.R. § 104.44(a). These "[m]odifications may include changes in the length of time permitted for the completion of degree requirements, substitution of

specific courses required for the completion of degree requirements, and adaptation of the manner in which specific courses are conducted." *Id*.  Similarly, under the ADA, a school must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

However, "[a]cademic requirements that the recipient can demonstrate are essential to the instruction being pursued by such student or to any directly related licensing requirement will not be regarded as discriminatory within the meaning of this section."  34 C.F.R. § 104.44(a).  Moreover, federal law "does not mandate that an educational institution 'lower or [ ] effect substantial modifications of standards to accommodate a handicapped person,' assuming such standards are reasonable." *McGregor v. Louisiana State University Board of Supervisors*, 3 F.3d 850, 858 (5th Cir. (1993) (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 423 (1979)), *cert. denied*, 510 U.S. 1131 (1994).  While "the extent of an "institution's affirmative duties to accommodate handicapped individuals is far from clear . . . [, it] must make 'reasonable,' but not 'fundamental' or 'substantial' modifications to accommodate the handicapped." *Id*.  "However, absent evidence of discriminatory intent or disparate

impact, we must accord reasonable deference to the [school's] academic decisions." *Id*. at 859.

In this case, the court concludes that BCD was not required to provide any further accommodations for Aragona and his learning disability, because Aragona failed to make a request for reasonable accommodations.  During time period in question in this case -- Aragona's last year at BCD -- the only request that could be construed as a request for reasonable accommodations was his desire to work more closely with his PAA.  Complaint ¶ 3.29.  However, because this did not constitute a request for reasonable accommodation for his learning disability, Aragona's claim for relief under Title II and Section 504 must fail.

First, the defendants do not appear to have done anything to stop Aragona from working more closely with his PAA.  According to his complaint, Aragona told Ashworth that his plan to deal with his learning disability was to "see his Patient Appointment Associate ("PAA") and organize his appointments with her."  *Id.* ¶ 3.29.  Aragona stated that "he had worked closely with his PAA in the past, and that doing so allowed him to be successful in meeting clinical requirements and overcoming his organizational difficulties."  *Id*.  In response, Ashworth told Aragona "that's bull___t, that's not a plan."  *Id*.  While it is clear that Ashworth did not think that this "plan" was enough for Aragona, there is no reason to believe that Ashworth said that Aragona could not work more closely with his PAA.  If Aragona could have dealt with

his academic deficiencies by working with his PAA, as he had done in the past, then he should have done so in his final semester.

Moreover, when compared with his request to be placed in BCD's extended five-year program, it is clear that Aragona's request to work more closely with his PAA was not a request for reasonable accommodations.  In the fall of 2004, Aragona applied for, and was accepted into, the five-year program.  TAMHSC's Motion's Appendix at 1-2.  In a handwritten letter, he wrote that he was applying "because I need reasonable accommodations for my learning disability."  *Id*. at 1.  The five-year program was clearly a "modification [of] academic requirements", *see* 34 C.F.R. § 104.44(a), made to reasonably accommodate Aragona's ADD.  In contrast, Aragona's request to work more closely with his PAA was not a true request for a modification of an academic requirement:  Aragona had already worked closely with his PAA in the past, Complaint ¶ 3.29, which meant no modification of any sort was necessary.

Finally, there is no reason to believe that Aragona could have solved his academic problems by working more closely with his PAA.  Aragona claims that working with his PAA would have "resolve[d] scheduling and organizational difficulties."  *Id*. ¶ 3.4.  However, Aragona's complaint demonstrates that his academic problems were much more extensive than simple "scheduling and organizational difficulties."  For example, one evaluation prepared by Ashworth states

that Aragona was "lacking in his diagnostic ability" and was not "prepared in clinic."

TAMHSC's Motion's Appendix at 4.  This was in addition to his unsatisfactory

ratings in "patient/roster management" and "paperwork management."  *Id*.  As

TAMHSC notes, "working more closely with his PAA would not have caused Plaintiff

to turn his paper in on time, [Complaint ¶ 3.26], show up for mandatory training, [*id*.

¶ 3.22], follow clinic infection control policies, clinic protocol, or keep his patient's

lab work from breaking, [*id*. ¶ 3.25]."  TAMHSC's Motion at 11-12.

As a result, Aragona's claims against the defendants under Title II and Section

504 fail.

### III.  CONCLUSION

For the reasons stated above, the defendants' motions for summary judgment

are **GRANTED**.  Judgment will be entered for the defendants on all of the plaintiff's

claims.

**SO ORDERED**.

February 14, 2012.

_A. Joe Fish_
**A. JOE FISH**
**Senior United States District Judge**